UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| CAMBRIDGE MUTUAL FIRE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>DEBORAH A. WESOJA,<br>as Guardian and Conservator of<br>Bianca J. Mackay, and<br>CHENDA DOEUR,<br><br>Defendants. | Docket No. 2:22-cv-00363-NT |

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

Before me are cross-motions for summary judgment in a case that involves an insurance dispute over a motor vehicle accident (the "**Accident**") that occurred on August 25, 2021, in Brunswick, Maine. The Plaintiff, Cambridge Mutual Fire Insurance Company ("**Cambridge Mutual**"), contends in its summary judgment motion that it is entitled to a declaratory judgment that it owes no duty under an umbrella insurance policy it issued to Defendant Chenda Doeur to indemnify him for losses Bianca J. Mackay incurred during the Accident (ECF No. 39). Defendant Deborah A. Wesoja, as Mackay's guardian and conservator, brings a cross-motion for summary judgment, joined by Defendant Chenda Doeur, seeking a declaration that Cambridge Mutual must indemnify Doeur under the umbrella policy for Mackay's losses (ECF Nos. 40 & 41). For the reasons stated below, the Plaintiff's motion is **GRANTED** and the Defendants' motions are **DENIED**.

# FACTUAL BACKGROUND[1]

## I. The Accident

At the time of the Accident, Defendant Chenda Doeur, the sole owner of Samaki Seafood, Inc. ("**Samaki Seafood**"), was driving southbound on Route 1 to deliver a load of Samaki Seafood lobsters to Cape Seafood, Inc. Am. Stipulation of Facts ("**Stip. SMF**") (ECF No. 38-1) ¶¶ 6–7. Douer was driving a 2020 Freightliner M2 106 truck that was leased to Samaki Seafood. Stip. SMF ¶¶ 5, 11. Doeur negligently failed to stop and collided with the back of Mackay's vehicle, which was stopped in a line of southbound vehicles entering Brunswick.[2] Stip. SMF ¶ 7. Mackay sustained catastrophic bodily injuries and died during the pendency of this action. Stip. SMF ¶ 7; Suggestion of Death (ECF No. 52). The value of Mackay's claim for damages resulting from the Accident exceeds $1,250,000. Stip. SMF ¶ 9.

## II. The Insurance Policies

At the time of the Accident, Doeur and Samaki Seafood had numerous insurance policies.[3] Of primary importance here is a personal umbrella policy that

---

[1] This factual background is taken from the parties' statements of facts and the exhibits submitted in connection with them.

[2] As a result of the Accident, on July 6, 2023, Doeur entered a plea of guilty to aggravated driving to endanger, a Class C felony predicated on criminal negligence. Am. Stipulation of Facts ("**Stip. SMF**") ¶ 8 (ECF No. 38-1).

[3] Samaki Seafood, Inc. had a commercial auto insurance policy issued by Progressive Northern Insurance Company (the "**Commercial Auto Policy**"). Stip. SMF ¶ 13(a); Stipulation of Facts Ex. A (ECF Nos. 33-1–33-2). Doeur had five other policies:
- A personal automobile insurance policy issued by Union Mutual Fire Insurance Company (the "**Personal Auto Policy**"). Stip. SMF ¶ 13(b); Stipulation of Facts Ex. B (ECF No. 33-3).
- A businessowners policy issued by Union Mutual Fire Insurance Company. Stip. SMF ¶ 13(c); Stipulation of Facts Ex. C (ECF No. 33-4).
- A homeowners policy issued by Cambridge Mutual. Stip. SMF ¶ 13(d); Stipulation of Facts Ex. D (ECF Nos. 33-5–33-6).

Cambridge Mutual issued to Doeur (the "**Umbrella Policy**"). Stip. SMF ¶ 13(f); Ex. F (ECF No. 33-8). Although the Umbrella Policy provides excess insurance coverage over several of Doeur's underlying policies, the parties focus their analysis on whether the Umbrella Policy provides coverage over and above a commercial auto policy issued by Progressive Northern Insurance Company (the "**Commercial Auto Policy**").

The parties agree that the Commercial Auto Policy underlies Doeur's Personal Umbrella Policy. The Commercial Auto Policy has a bodily injury limit of $1,000,000 and lists the Freightliner as a covered vehicle. Stip. SMF ¶ 16; Stip. of Facts Ex. A.1, at 154–55. Progressive Northern Insurance Company has tendered its policy limit of $1,000,000 to Mackay. Stip. SMF ¶ 16.

The Umbrella Policy provides that Cambridge Mutual "will pay damages, in excess of the 'retained limit,'[4] for 'bodily injury' . . . for which an 'insured' becomes legally liable due to an 'occurrence' to which this insurance applies." Umbrella Policy 17 (Section II.A.1). "Bodily injury" means "bodily harm, sickness or disease, including

---

- A commercial umbrella insurance policy issued by Union Mutual Fire Insurance Company, Stip. SMF ¶ 13(e); Stipulation of Facts Ex. E (ECF No. 33-7).
- A personal umbrella insurance policy issued by Union Mutual Fire Insurance Company (the "**Umbrella Policy**"). Stip. SMF ¶ 13(f); Stipulation of Facts Ex. F (ECF No. 33-8).

4 For purposes of injuries arising out of the use of an auto, "retained limit" is defined as:
1. The retained policy limits for [underlying] auto liability coverage shown in the Declarations]; and
2. The total limits of any other coverage provided by "underlying insurance" and any other insurance that applies to an "occurrence" which:
 a. Are available to an "insured"; or
 b. Would have been available except for the bankruptcy or insolvency of an insurer providing "underlying insurance".

Umbrella Policy 15. The parties have stipulated that the value of Mackay's claim exceeds $1,250,000. Stip. SMF ¶ 9. The Plaintiff explains that "the significance of that number is that it is the total of the policy limits of Mr. Doeur's commercial auto and personal auto policies." Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. ("**Pl.'s Opp'n**") 13 (ECF No. 43).

3

required care, loss of services and death that results." Umbrella Policy 5 (Section I.F). The Accident constitutes an "occurrence" as that word is defined in the Umbrella Policy. Stip. SMF ¶ 4.

The Umbrella Policy contains a number of exclusions, two which are relevant here. First, the Umbrella Policy does not cover "[b]odily injury" "arising out of or in connection with a 'business' "[5] in which the insured person is engaged (the "**Business Exclusion**"). Umbrella Policy 8 (Section III.A.3). The Business Exclusion contains several exceptions. As relevant here, the Business Exclusion does not apply to the insured's "use of an 'auto' for 'business' purposes, other than an auto business." Umbrella Policy 8–9 (Section III.A.3.e). The Umbrella Policy defines "auto" as:

1. A private passenger motor vehicle, motorcycle, moped or motor home;
2. A vehicle designed to be pulled by a private passenger motor vehicle or motor home; or
3. A farm wagon or farm implement while towed by a private passenger motor vehicle or motor home.

Umbrella Policy 5 (Section I.E).

The second relevant exclusion eliminates coverage for " '[b]odily injury' . . . arising out of the ownership or operation of an 'auto' while it is being used as a public or livery conveyance" (the "**Livery Exclusion**"). Umbrella Policy 8–9 (Section III.A.4). The Umbrella Policy does not define "public or livery conveyance."

---

[5] "Business" means "[a] trade, profession or occupation engaged in on a full-time, part-time or occasional basis; or [a]ny other activity engaged in for money or other compensation." Umbrella Policy 5 (Section I.G).

4

The Umbrella Policy has been amended at least five times by endorsements. Relevant here is the "Personal Umbrella Liability Policy Auto Liability Following Form Endorsement" ("**Following Form Endorsement**"). Umbrella Policy 3, 15. The Following Form Endorsement begins with the statement: "[w]ith respect to the coverage provided by this endorsement, the provisions of the policy apply unless modified by the endorsement." Umbrella Policy 15. The Following Form Endorsement makes two changes to the Umbrella Policy. First, it replaces the definition of "retained limit" with respect to "bodily injury" or "property damage" arising out of the use of any "auto." *See supra* n.4. Second, the Following Form Endorsement "add[s]" the following exclusion:

> The coverages provided by this policy do not apply to "bodily injury" or "property damage" arising out of:
>
> a. The ownership of any "auto" by an "insured";
> b. The maintenance, occupancy, operation, use, loading or unloading of any "auto" by any person;
> c. The entrustment of any "auto" by an "insured" to any person;
> d. The failure to supervise or negligent supervision of any person involving any "auto" by an "insured"; or
> e. Vicarious liability, whether or not imposed by law, for the actions of a child or minor involving any "auto".
>
> However, this exclusion does not apply to the extent that auto liability coverage is provided by "underlying insurance" at the time of the "occurrence".

Umbrella Policy 15.

### III. Procedural History

In March of 2022, Bianca Mackay, by and through her Guardian and Conservator, Deborah Wesoja, commenced suit (the "**tort action**") against Chenda Doeur, Ryder Truck Rental, Inc., and Samaki Seafood, Inc., in Cumberland County

5

Superior Court, Docket No. CV-2022-100. Stip. SMF ¶ 14. In February of 2023, Wesoja amended her complaint and added a fourth defendant, Cape Seafoods LLC. Stip. SMF ¶ 15 & Ex. G (ECF No. 33-9).

On November 16, 2022, Cambridge Mutual filed this action seeking a declaration that it has no duty to indemnify or defend Doeur in the tort action.[6] *See* Declaratory J. Compl. 4–5 (ECF No. 1). On September 7, 2023, Cambridge Mutual, Wesoja, and Doeur each filed a motion for summary judgment. Pl.'s Mot. for Summ. J. ("**Pl.'s MSJ**") (ECF No. 39); Def., Bianca J. Mackay, By and Through her Guardian and Conservator, Deborah A. Wesoja's Mot. for Summ. J. ("**Defs.' MSJ**") (ECF No. 40); Def. Chenda Doeur's Mot. for Summ. J. (ECF No. 41).

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if a rational factfinder could resolve it in favor of either party. *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020). A fact is material if "its existence or nonexistence has the potential to change the outcome of the suit." *Rando v. Leonard*, 826 F.3d 553, 556 (1st Cir. 2016) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)).

"The party moving for summary judgment bears the initial burden of showing that no genuine issue of material fact exists." *Feliciano-Muñoz*, 970 F.3d at 62. Once

---

[6] The parties have stipulated that Progressive Northern Insurance Company has retained counsel to defend and is defending Doeur. Stip. SMF ¶ 16. Thus, the Plaintiff is not pursuing its duty to defend count.

6

it does so, "the burden shifts to the nonmoving party . . . to demonstrate that a trier of fact reasonably could find in his favor" with respect to each issue on which he bears the burden of proof. *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)). "[C]onclusory allegations, improbable inferences, and unsupported speculation" do not suffice. *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 92–93 (1st Cir. 2018) (quoting *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 842 (1st Cir. 1993)). Judgment should be entered "if . . . there can be but one reasonable conclusion" come trial, but "[i]f reasonable minds could differ," judgment should not be entered for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986). Therefore, "summary judgment is improper when the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." *Morales-Melecio v. U. S. (Dep't of Health & Hum. Servs.)*, 890 F.3d 361, 368 (1st Cir. 2018) (internal quotation marks omitted).

"Cross motions for summary judgment do not change the standard." *Perea v. Ed. Cultural, Inc.*, 13 F.4th 43, 50 (1st Cir. 2021) (citation omitted). I must "view each motion separately and draw all reasonable inferences in favor of the respective non-moving party," *EdgePoint Cap. Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50, 57 (1st Cir. 2021) (citation omitted), and "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed," *Alasaad v. Mayorkas*, 988 F.3d 8, 16 (1st Cir. 2021).

# DISCUSSION

The parties dispute whether Cambridge Mutual must pay out under the Umbrella Policy. At issue is the effect of a few provisions of the Umbrella Policy: (1) the Following Form Endorsement; (2) the Business Exclusion; and (3) the Livery Exclusion. Before addressing the arguments, I lay out the basics of insurance contracts and the standards that Maine courts use for interpreting them.

## I.  Insurance Contract Basics

### A.  Interpreting Insurance Contracts

"The meaning of the language used in an insurance contract is a question of law." *Peerless Ins. Co. v. Wood*, 685 A.2d 1173, 1174 (Me. 1996); *Am. Fire & Cas. Co. v. Pettegrow*, No. 1:20-cv-00250-JDL, 2021 WL 6197398, at *7 (D. Me. Dec. 30, 2021). "An insurance contract is ambiguous if it is reasonably susceptible of different interpretations from the perspective of an average person untrained in either the law or the insurance field in light of what a more than casual reading of the policy would reveal to an ordinarily intelligent insured." *Bibeau v. Concord Gen. Mut. Ins. Co.*, 2021 ME 4, ¶ 12, 244 A.3d 712 (internal citations and quotation marks omitted). When a policy is unambiguous, Maine courts "interpret it in accordance with its plain meaning." *Id.* (quoting *Kelley v. N.E. Ins. Co.*, 2017 ME 166, ¶ 5, 168 A.3d 779). But ambiguous policy language is construed "strictly against the insurance company and liberally in favor of the policyholder." *Kelley*, 2017 ME 166, ¶ 5, 168 A.3d 779. Moreover, "policy exclusions are 'construed strictly against the insurer.' " *Allstate Prop. & Cas. Ins. Co. v. Jones*, --- F. Supp. 3d ---, 2023 WL 8259154, at *3 (D. Me. Nov. 29, 2023) (quoting *Foremost Ins. Co. v. Levesque,* 2005 ME 34, ¶ 7, 868 A.2d 244).

8

"However, a dispute over the meaning of a term, 'or the inability of the insured to understand the policy, does not render the contract ambiguous.'" *Progressive Nw. Ins. Co. v. Metro. Prop. & Cas. Ins. Co.*, 2021 ME 54, ¶ 10, 261 A.3d 920 (quoting *Colford v. Chubb Life Ins. Co. of Am.*, 687 A.2d 609, 614 (Me. 1996)).

Maine courts "construe the insurance contract as a whole and according to the intentions of the parties." *Sch. Union No. 37 v. United Nat'l Ins. Co.*, 617 F.3d 554, 561 (1st Cir. 2010). As such, "interpretations that would render any particular contractual provision meaningless" are to be avoided. *Reliance Nat'l Indem. v. Knowles Indus. Servs., Corp.*, 2005 ME 29, ¶ 24, 868 A.2d 220; *see Zhao v. CIEE Inc.*, 3 F.4th 1, 5 (1st Cir. 2021). Reading the contract as a whole may resolve an apparent ambiguity elsewhere in the contract. *Reliance*, 2005 ME 29, ¶ 24, 868 A.2d 220. In addition, a policy's terms "cannot be enlarged or diminished by judicial construction." *Johnson v. Allstate Ins. Co.*, 1997 ME 3, ¶ 9, 687 A.2d 642.

### B. Excess Insurance Contracts

Excess insurance is a term given to insurance policies that provide a second layer of coverage above and beyond an underlying policy. Excess insurance policies essentially come in two forms: umbrella policies and "true excess" policies. *See Dickau v. Vt. Mut. Ins. Co.*, 2014 ME 158, ¶¶ 10–11, 10 A.3d 621. "A true excess policy 'provides coverage above a single primary policy for specific risks,' and 'is purchased by the insured to protect against large losses or an accumulation of small losses.'" *Id.* (quoting 4 Rowland H. Long, The Law of Liability Insurance § 22.03 (2005)). "[A] true excess policy effectively extends the policy limit for an underlying primary policy covering precisely the same losses." *Id.* ¶ 10.

9

An umbrella policy typically covers more than one primary policy, such as homeowners' insurance, car insurance, and general liability insurance. *Id.* ¶ 11. "As with true excess policies, umbrella policies are 'parasitic' in that they require that the insured maintain and exhaust an underlying primary policy." *Id.* "The secondary nature of umbrella coverage, covering only catastrophic losses, is reflected in its premiums, which are ordinarily quite low." *Id.*

Some excess insurance policies may contain "follow form" or "following form" provisions. Pl.'s MSJ 9–12; Defs.' MSJ 13. The First Circuit has explained that " 'follow form' refers to the practice, common in excess policies, of having the second-layer coverage follow substantively the primary layer provided by the main insurer." *Insituform Techs., Inc. v. Am. Home Assurance Co.*, 566 F.3d 274, 278 (1st Cir. 2009). The theory is that "it would be easy to write a short excess policy that adopted all of the terms of the primary (except that coverage cuts in after the primary layer is exhausted and cuts off at the excess policy limit)." *Id.*

## II. The Umbrella Policy

The Umbrella Policy provides that Cambridge Mutual "will pay damages, in excess of the 'retained limit', for . . . '[b]odily injury' or 'property damage' for which an 'insured' becomes legally liable due to an 'occurrence' to which this insurance applies." Umbrella Policy 17 (Section II.A.1). The parties agree that the Umbrella Policy is not a "true excess" policy. Pl.'s MSJ 12; Defs.' MSJ 8. They agree that Doeur is an "insured" and that he is liable for Mackay's "bodily injur[ies]." Pl.'s MSJ 4–5, 16; Defs.' MSJ 6; Stip. SMF ¶¶ 7–8. They stipulate that the Accident is an "occurrence." Stip. SMF ¶ 4. The parties agree that the Commercial Auto Policy constitutes "underlying

insurance," and that its "retained limit" has been met. *See* Stip. SMF ¶ 16; Pl.'s MSJ 14, 26; Defs.' MSJ 6–7. But the parties disagree on the effect of the Following Form Endorsement and whether the Business Exclusion of the Umbrella Policy applies. I turn to those questions next.

### A.     The Effect of the Following Form Endorsement

The parties dispute the import of the Following Form Endorsement. The Defendants contend that by adding an endorsement that uses the term "Following Form" in the title, Cambridge Mutual intended to grant excess coverage that follows the form of Doeur's underlying Commercial Auto Policy. Defs.' MSJ 13–14. The Defendants maintain that because the Commercial Auto Policy provided coverage, the Umbrella Policy automatically should follow form and provide coverage too.

The Plaintiff argues that the Following Form Endorsement does not create a follow form policy. Pl.'s MSJ 12. The Plaintiff points out that the Umbrella Policy comes with its own definitions, conditions, coverage provisions, and exclusions. Pl.'s MSJ 12. It argues that despite the title of the Following Form Endorsement, the language of the endorsement makes clear that the Umbrella Policy's provisions still apply unless the endorsement modifies them. Pl.'s MSJ 24–25. The Plaintiff concedes that the Following Form Endorsement's exclusion for bodily injury from use of an "auto" does not apply because Doeur has underlying auto liability insurance. Pl.'s MSJ 26. But the Plaintiff contends that the Following Form Endorsement does not negate the rest of the Umbrella Policy, and it argues that two of the Umbrella Policy exclusions—the Business Exclusion and the Livery Exclusion—bar coverage. Pl.'s MSJ 26.

The First Circuit dealt with a similar situation in *Insituform Technologies, Inc. v. American Home Assurance Co.* There, Insituform Technologies, Inc. ("**Insituform**") had an umbrella policy from American Home Assurance Company ("**American Home**"). *Insituform*, 566 F.3d at 275. Insituform, a subcontractor, failed to meet the terms of a contract to rehabilitate sewer pipes, and its primary insurer covered Insituform's costs to repair and replace the damaged pipes up to the policy's limit. *Id.* American Home denied excess coverage because its umbrella policy had certain exclusions that the underlying insurance lacked. *Id.* at 275–76. Insituform argued that a separate endorsement in the American Home policy with the heading "Following Form Hazards" required American Home to follow the form of the underlying policy despite the additional exclusions in the American Home policy. *See id.* at 276–78.

After explaining that "[t]he phrase 'follow form' refers to the practice, common in excess policies, of having the second-layer coverage follow substantively the primary layer provided by the main insurer," the First Circuit went on to state that " 'follow form' is a loose term, and the American Home policy does not by any means 'follow the form' of the [underlying] policy in all respects." *Id.* at 278. The First Circuit noted that it would be "a mistake to assume precision in such terminology; and even where a policy is described as 'follow form,' it does not necessarily provide coverage that is substantively *identical* to the underlying one." *Id.* at 278 n.3. Because the American Home policy had provisions and exclusions of its own, the "follow form"

language did not "create new liability for American Home inconsistent with its other basic coverage and exclusion provisions." *Id.* at 279–80.[7]

Here, as in *Insituform*, the Following Form Endorsement must be analyzed in the context of the entire agreement. A holistic reading makes clear that the Umbrella Policy does not follow the form of the underlying Commercial Auto Policy. The Following Form Endorsement plainly states below the title, "With respect to the coverage provided by this endorsement, the provisions of the policy apply unless modified by the endorsement." Umbrella Policy 15. As in *Insituform*, the Umbrella Policy here "has a lengthy set of coverage provisions and exclusions of its own." *Insituform*, 566 F.3d at 278. The Following Form Endorsement makes only two modifications—it replaces the definition of "retained limit,"[8] and adds a new exclusion for "bodily injury" arising out of the use of an "auto" unless the insured has an underlying auto liability policy. Umbrella Policy 15. Notably, the statement in the Following Form Endorsement that "[t]he following exclusion is *added"* makes it clear that the Following Form Endorsement does not *replace* the other exclusions in the

---

[7] Similarly, a Louisiana appeals court interpreted what seems to be the same language as the Following Form Endorsement to find that the umbrella policy at issue did not strictly follow the form of the underlying policy. *See Barber v. La. Mun. Risk Mgmt. Agency*, 236 So. 3d 689, 696–98 (La. Ct. App. 2017). In doing so, it noted that it "must examine the terms of that endorsement, rather than merely the title, to determine the effect of that endorsement." *Id.* at 697. "Nothing in th[e] endorsement state[d] that the umbrella policy adopt[ed] the same coverages and exclusions as the [underlying] policy," so the court found that the umbrella policy did not adopt the underlying policy's coverage. *Id.* at 698.

[8] The Plaintiff makes the reasonable point that the change in the retained limit definition was to make clear that where two underlying policies overlap (for example, a vehicle involved in an accident was covered under both an underlying personal auto policy and an underlying commercial auto policy), both underlying policies would have to be exhausted before the umbrella coverage kicked in. Pl.'s Opp'n 12–13.

13

Umbrella Policy, including the Business Exclusion. Umbrella Policy 15 (emphasis added). To conclude that the Umbrella Policy follows the coverage of the Commercial Auto Policy because the title of the endorsement contains the words "following form" would render meaningless the sentence below the title and would have me rewrite the Umbrella Policy to make the "added" exclusion a "substitution" for exclusions related to autos in the body of the Umbrella Policy.

Because I reject the Defendants' argument that the Following Form Endorsement automatically triggers the Plaintiff's obligation to pay the excess coverage, I go on to consider whether the Umbrella Policy itself requires coverage.

### B.     The Effect of the Business Exclusion

As discussed above, the Umbrella Policy contains a number of exclusions, one of which is the Business Exclusion, which provides that the Umbrella Policy's coverages do not apply to "bodily injury . . . arising out of or in connection with a 'business' . . . [e]ngaged in by an 'insured.' "[9] Umbrella Policy 8 (Section III.A.3). The Business Exclusion contains several exceptions. Relevant here, the Umbrella Policy states that the Business Exclusion "does not apply to: . . . [t]he use of an 'auto' for 'business' purposes . . . . by an 'insured.' " Umbrella Policy 8–9 (Section III.A.3.e). The Umbrella Policy defines the term "auto" as "[a] private passenger motor vehicle, motorcycle, moped or motor home;" "[a] vehicle designed to be pulled by a private passenger motor vehicle or motor home;" or "[a] farm wagon or farm implement while

---

[9]     The parties agree that Doeur was engaged in "business" when the Accident happened. *See* Stip. SMF ¶ 6; Pl.'s MSJ 16.

14

towed by a private passenger motor vehicle or motor home." Umbrella Policy 5 (Section I.E).

The parties disagree over whether the Freightliner M2 106 truck that Doeur was driving can be a "private passenger motor vehicle," which the Umbrella Policy does not define. Pl.'s MSJ 17; Opp'n of Def., Bianca J. Maccay [*sic*], By and Through Deborah A. Wesoja, to Pl.'s Mot. for Summ. J. ("**Defs.' Opp'n**") 8–9 (ECF No. 46). The Plaintiff points to the definition of "private passenger motor vehicle" supplied by the Maine Insurance Code, 24-A M.R.S. § 2927(1)(D), and the Maine Bureau of Insurance rule implementing the statute, 02-031 C.M.R. ch. 175, § 2. Pl.'s MSJ 17–19. The Defendants push back that this definition is inapplicable and urge me to read the Umbrella Policy from the perspective of an ordinarily intelligent insured, untrained in the law or insurance field. Defs.' Opp'n 9–10, 12.

I agree with the Defendants that I must consider how an ordinary person would read the Umbrella Policy, but that reading precludes coverage in this case. While I agree with the parties that "private passenger motor vehicle" may be hard to define, whatever definition applies, no average person reading that term would conclude that a 2020 Freightliner M2 106 box truck with a gross vehicle weight rating over 26,001 pounds (requiring a commercial driver's license to drive) used for the business of delivering loads of lobsters is a "private passenger motor vehicle."

The Defendants contend that excluding the Freightliner truck from the definition of "private passenger motor vehicle" would violate Maine contract interpretation principles because it would render meaningless the Amended

15

Declaration of the Umbrella Policy, which, according to the Defendants, required Doeur to have a commercial auto policy. Defs.' Opp'n 15–16. But, assuming arguendo that Doeur was required[10] to purchase a commercial auto policy, and accepting the fact that the Commercial Auto Policy specifically listed the Freightliner truck, Doeur still has to meet the *other* relevant provisions of the Umbrella Policy. Maintaining the minimum commercial auto coverage is a necessary condition to receiving secondary coverage over such a policy, but it is not enough alone to automatically trigger coverage. In this case, the fact that the Freightliner truck cannot be considered an "auto" under the Umbrella Policy means that the exception to the exclusion for injuries arising out of or in connection with a business does not apply.

Relatedly, the Defendants argue that finding that there was no coverage would defeat the purpose of listing commercial auto policies in the Umbrella Policy's Declarations. Defs.' MSJ 14. I agree that the Umbrella Policy likely cuts out a significant amount of excess coverage for injuries arising from accidents involving commercial vehicles with its definition of "auto," but that does not mean that it does not cover anything at all. As the Plaintiff points out and the Defendants do not contest, a commercial auto policy could still provide coverage over a "private passenger motor vehicle" if that vehicle is used for commercial purposes, such as a small business owner using a van or small truck for business and as a family car. *See*

---

[10] The Plaintiff effectively debunks the idea that Doeur was "required" to purchase any particular underlying policy. *See* Pl.'s Opp'n 2–5.

16

Pl.'s MSJ 20; Defs.' Opp'n 14. Thus, the Umbrella Policy could still provide excess coverage over a commercial auto policy even if the Freightliner truck is not covered.

Finally, the Defendants point out that the Following Form Endorsement adds the exclusion that essentially provides no coverage for any bodily injury caused by an "auto," but that this exclusion does not apply because there was underlying insurance at the time of the Accident. Defs.' Opp'n 8. According to the Defendants, the fact that this broad auto exclusion does not apply has to mean that the narrower Business Exclusion dealing with "autos" would not apply either. Defs.' Opp'n 8–9. But, as I explained above, this misreads the plain terms of the contract, which state that the broad auto exclusion is an *addition* and the other terms of the Umbrella Policy are unaffected.[11] Because, even drawing all reasonable inferences in the Defendants' favor there is no reading of the Umbrella Policy[12] that would give them coverage, the Plaintiff's motion must be granted.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Plaintiff's motion for summary judgment (ECF No. 39). Cambridge Mutual has no duty under the Umbrella Policy to indemnify Chenda Doeur in the underlying action brought against Doeur by Mackay. The Court **DENIES** the Defendants' motions (ECF Nos. 40 & 41).

---

[11]    The Defendants' argument that reading the Business Exclusion to exclude coverage here renders the Follow Form Endorsement meaningless because the Umbrella Policy already covers his use of his own car for business or pleasure is also a nonstarter. *See* Opp'n of Def., Bianca J. Maccay [*sic*], By and Through Deborah A. Wesoja, to Pl.'s Mot. for Summ. J. 13–14 (ECF No. 46). The Following Form Endorsement does exactly what it says—it changes the definition of "retained limit" and adds an "auto" exclusion that is much broader than the Business Exclusion.

[12]    Because I conclude that the Business Exclusion applies, I do not address the Livery Exclusion.

17

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 29th day of May, 2024.